## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA )
)
v. )
)     **Criminal No. 04-379-03 (RCL)**
TIMOTHY R. THOMAS, )
)
     Defendant. )
_____)

## MEMORANDUM OPINION

### I. Introduction

This matter comes before the Court on the post-trial motions [755, 930, 974] of defendant Timothy Thomas.  The jury found defendant Thomas guilty of Narcotics Conspiracy (Count 1), RICO Conspiracy (Count 2), Possession with Intent to Distribute a Controlled Substance (cocaine) ("PWID") (Count 10), and numerous counts of Unlawful Use of a Communication Facility (Counts 33, 46, 47, 49, 52, 63, 64, 65, 66, and 67).

After trial, defendant moved the Court within seven days for an extension of time to file post-trial motions.  The Court granted defendant's motion and permitted him to file post-trial motions by August 25, 2006.  The defendant timely filed his motion [755] seeking judgment of acquittal, or in the alternative, a new trial on August 25, 2006.  Upon a thorough review of each party's filings, the applicable law, and the entire record herein, this Court has determined that the defendant's motion [755] for acquittal or for a new trial shall be denied.

Defendant filed a supplement [930] to his original motion [755] on March 5, 2007.  In the supplemental motion, defendant requests a new trial based on newly discovered evidence and several unrelated grounds.  For the reasons set forth in Part II.C.1., *infra*, this Court finds that the

newly discovered evidence raised in the supplemental motion does not meet the standard for a new trial under the law of this Circuit. As such, the motion for a new trial based on these grounds shall be denied. As for the remaining arguments raised in the supplemental motion, these arguments are untimely and are not properly before this Court. Alternatively, even if these issues were timely, this Court would reject defendant's motion for new trial for reasons set forth in this Opinion.

On August 3, 2007, defendant filed an additional motion [974] for a new trial based on newly discovered evidence. This motion, in large part, repeats arguments raised in defendant's initial motion [755] and supplemental motion [930]. As with defendant's supplemental motion [930], this Court finds that the evidence raised in the latest motion for new trial does not satisfy the standard for a new trial under the law of this Circuit. Therefore, defendant's motion [974] shall be denied.

## II. Discussion

### A.    Legal Standard

#### 1.    *Motion for Acquittal*

A motion for acquittal filed after the jury has returned a guilty verdict asks the Court to set aside the verdict and enter a judgment of acquittal. FED. R. CRIM. P. 29. In reviewing a motion for judgment of acquittal, the Court must view all evidence in the light most favorable to the Government, giving it the benefit of all reasonable inferences. *See United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983); *see also United States v. Fennell*, 53 F.3d 1296, 1298 (D.C. Cir. 1995) (providing for the deferential review of jury verdicts); *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990) (noting that "a jury is entitled to draw a vast range of

reasonable inferences from evidence").  Accordingly, motions for judgment of acquittal are granted on the basis of insufficient evidence only if the court concludes, as a matter of law, that no reasonable juror could have convicted the defendant based on the evidence presented.  *See United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983) ("[A] judgment of acquittal is appropriate only when there is no evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt.") (citing *United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977)).

  2. *Motion for New Trial*

  Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33.  Generally, any such motion must be filed within seven days of the verdict unless otherwise specified by the Court.  FED. R. CRIM. P. 33(b)(2).

  The decision of whether to grant a motion for a new trial is "committed to the sound discretion of the trial judge."  *Reese*, 561 F.2d at 902.  Such a decision is subject to reversal "only for abuse of discretion or misapplication of the law."  *Id.* (internal citations omitted).  The defendant bears the burden of showing that a new trial is justified.  *See id.*  Furthermore, even if the defendant demonstrates that an error occurred, a new trial is not warranted unless the defendant shows that the error influenced the jury to such a degree that a substantial right of the defendant was affected.  *See* FED. R. CRIM. P. 52(a) (describing harmless error provision that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded"); *Kotteakos v. United States*, 328 U.S. 750, 757 (1946) (noting that the harmless error provision restates existing law that technical errors, defects, or exceptions that do not affect

the substantial rights of the parties are not grounds for reversal).

Having carefully considered defendant's arguments, this Court finds that defendant fails to carry his burden under either standard and accordingly is entitled to neither a judgment of acquittal nor a new trial. Defendant has not successfully demonstrated that any errors occurred; even if errors had occurred, defendant failed to show that the errors affected his substantial rights.

**B.    Defendant's Motion for a Judgment of Acquittal**

*1.    Narcotics Conspiracy*

Defendant Thomas argues that he is entitled to acquittal of all charges related to the narcotics conspiracy. According to defendant, the government failed to establish proof of an agreement between defendant Thomas and others with regard to the single, overarching conspiracy charged. *See* Def.'s Mot. [755] at 5. Defendant Thomas contends that the proof offered at trial demonstrated the existence of multiple conspiracies, rather than the single one alleged in the Indictment. *See id.* (citing *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988) (citing *Kotteakos*, 328 U.S. at 755)).

The government counters that the evidence shows that the drug conspiracy at issue in this case was a single overarching conspiracy in which each conspirator shared a common goal of making money by selling drugs in the District of Columbia. *See* Gov.'s Opp. at 12. The government further asserts that the head and arms of the Eiland/Miller conspiracy were inextricably intertwined in such a way that all individual participants, including defendant Thomas, knew that there were others involved in the narcotics enterprise. *See id.* at 14–16.

Under the law of this Circuit, "[a] variance between the allegations of the indictment and

the proof at trial constitutes grounds for reversal only if the [defendant] proves (1) that the evidence at trial established facts materially variant from those alleged in the indictment, and (2) that the variance caused substantial prejudice." *Tarantino*, 846 F.2d at 1391 (internal citations omitted).  Within the context of a conspiracy prosecution, the defendant bears the burden of proving two elements:  "(1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *Id.* (internal citation omitted).  A defendant must prove both elements in order to be entitled to relief.[1]  For the following reasons, the Court finds that defendant Thomas has not proven either element in this case.

   a.     **Sufficiency of Evidence of a Single Narcotics Conspiracy**

In order to determine whether the evidence at trial established a single chain conspiracy or multiple independent conspiracies, the Court must consider a variety of factors.  First, and most important, is "whether the conspirators share a common goal, such as the possession and distribution of narcotics for profit." *Tarantino*, 846 F.2d at 1393 (internal citations omitted).  Second, the Court must consider the degree of dependence among the co-conspirators.[2] *Id.*

---

[1] As the D.C. Circuit has found, a verdict for a single conspiracy "must be upheld if the evidence adequately supports a finding that a single conspiracy existed." *Tarantino*, 846 F.2d at 1391; *see also United States v. Gaviria*, 116 F.3d 1498, 1516 (D.C. Cir. 1997) (denying defendant's challenge to conviction for conspiracy on grounds that a variance existed "because the evidence demonstrates that [defendant] did participate in the charged conspiracy").  Moreover, a deficiency in proof of a single conspiracy is not fatal to the government if such a deficiency does not substantially harm the defendant.  *See United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006).

[2] Inherent in this element is the notion of whether the evidence supports an inference that the conspirators knew of their link to other co-conspirators.  *Tarantino*, 846 F.2d at 1393.

(internal citations omitted).  Third, and least significant, is whether there exists any "overlap of participants in the various operations claimed to comprise a single conspiracy." *Id.* at 1393 (internal citation omitted).   When considering each of these factors, the Court must also be mindful of the longstanding precedent that "participants in a continuous drug distribution enterprise can be parties to a single conspiracy even if they do not all know one another, so long as [the evidence shows that] each knows that his own role in the distribution of drugs and the benefits he derives from his participation depend on the activities of the others." *United States v. Childress*, 58 F.3d 693, 709–10 (D.C. Cir. 1995).  Upon consideration of the evidence presented at trial against defendant Thomas, the government has clearly established that a single conspiracy existed, and that defendant Thomas knowingly participated in this overarching conspiracy.

i.     *Evidence Shows Conspirators Shared a Common Goal*

First, the evidence shows that the conspirators shared a common goal of distributing mass quantities of drugs for profit in the Washington, D.C. area.  As joint heads of the conspiracy, Eiland and Miller gained nearly $20,000 each week from the sale of drugs.  *See* Trial Tr., 125, Apr. 11, 2006, a.m.  Darius Ames, a participant in the conspiracy, testified that, on one occasion, he used a money-counting machine to help Eiland count almost $800,000 in money located in a stash house used by Eiland, Miller, and Ames.  *See* Trial Tr., 60, Apr. 10, 2006, p.m.  Ames also testified that, on another occasion, he delivered a shoe box containing $90,000 from defendant Miller to defendant Eiland.  *Id.* at 58.  Further, Eiland and Miller used much of this revenue obtained from their narcotics activity in order to purchase an additional supply of drugs and to pay other members of the conspiracy.  *See* Trial Tr., 57–58, Mar. 28, 2006, p.m.

The evidence further showed that defendant Thomas invested his own money with

Eiland's money to attempt to purchase five kilograms of cocaine from Phoenix, Arizona.[3]  *See* Trial Tr., 57–58, Mar. 28, 2006, p.m.  As his consensual phone calls with Tyrone Thomas indicate, defendant Timothy Thomas stated that he hoped this investment in cocaine would yield an additional $50,000 in personal profit once the cocaine was sold on the street in the Washington, D.C. area.  *See* Consensual Phone Calls T-40, T-44.  Additionally, evidence showed that Miller offered to pay Tyrone Thomas to transport by Lincoln Town Car the $50,000 in cash belonging to defendants Timothy Thomas and Eiland to Phoenix, Arizona, and to return to Washington, D.C. with five kilograms of cocaine to be purchased by defendant Eiland.[4]  *See* Trial Tr., 56–58, Mar. 28, 2006, p.m.  Moreover, both Darius Ames and James Ingram were paid between $4,000 and $6,000 to fly with defendant Eiland to Phoenix, Arizona, so that they might smuggle heroin back into the Washington, D.C. area.  *See* Trial Tr., 73–87, Apr. 10, 2006, a.m.

In addition to his services in smuggling heroin from Phoenix, Arizona to Washington, D.C., Darius Ames was paid between $500 and $1000 each week for processing the smuggled raw heroin into street-level heroin.  *Id.* at 31–34.  As a lieutenant, Ricky Gore earned between $8,000 and $10,000 a week delivering drugs from defendant Eiland to street-level dealers, and returning the money from the street-level dealers to defendant Eiland.  *See* Trial Tr., 110–11, 124, Apr. 11, 2006, p.m.  Charles Brown, another participant in the conspiracy, was paid by

---

[3] The government presented evidence at trial showing that the overarching conspiracy involved an attempt to purchase five kilograms of cocaine from Phoenix, Arizona, for purposes of smuggling it back to Washington, DC, for distribution.  At the time of Tyrone Thomas's arrest, four kilograms of cocaine were found in the trunk of his car and seized.  The jury's verdict convicted defendant Thomas based on the four kilograms that were actually seized at the time of Tyrone Thomas's arrest.

[4] *See supra* note 3.

defendant Miller to accept a package of drugs delivered to Brown's residence.  *See* Trial Tr., 86, Apr. 25, 2006.  Finally, Brian Lipscombe, a hired hitman for the enterprise, was paid $10,000 in cash and was given a white Acura Legend in exchange for agreeing to murder Sorenson Oruche, a former drug supplier to the enterprise.  *See* Trial Tr., 43–45, Apr. 26, 2006.

In light of this evidence, it is clear to this Court that each of the conspirators in this case had the common goal of profiting from the drugs that were funneled through the Eiland/Miller enterprise.

### ii.     Evidence Shows Interdependence

Second, in a chain conspiracy, the success of the common objective of the conspiracy depends upon the successful operation of each link in the chain conspiracy.  *See Childress*, 58 F.3d at 709–10 ("participants in a continuous drug distribution enterprise can be parties to a single conspiracy even if they do not all know one another, so long as each knows that his own role in the distribution of drugs and the benefits he derives from his participation depends on the activities of the others."); *cf. Tarantino*, 846 F.2d at 1393 ("The existence of such a vertically integrated, loose-knit combination may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further a common unlawful objective, e.g., the distribution of narcotics.") (internal citation and quotations omitted).   "An individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation." *United States v. Agueci*, 310 F.2d 817, 827 (2d Cir. 1962), *cert. denied*, 372 U.S. 959 (1963).

In this case, the evidence clearly shows that there were was interdependence among the individual participants from each link of the drug conspiracy.  Members of the conspiracy,

including defendants Eiland and Miller, traveled outside the Washington, D.C. area to negotiate the purchase of wholesale narcotics. The individuals who purchased the wholesale drugs were obviously important to the conspiracy because, without the purchased wholesale narcotics, there would be no drugs to sell in the Washington, D.C. area at all.

Certain members of the conspiracy[5] then smuggled the purchased wholesale narcotics—in this case, cocaine and heroin—into the Washington, D.C. area. The raw narcotics needed to be smuggled into the Washington, D.C. area because they did not originate there.[6] Accordingly, the individuals in the smuggling arm of the conspiracy were important to the success of the enterprise because, without them, the common goal of making profit by selling drugs in the Washington, D.C. area could not be realized.

Once the raw drugs were smuggled into the Washington, D.C. area, they were then given to other conspirators—Darius Ames and Eric Butcher—who processed and packaged the drugs to prepare them for street-level distribution and consumption. As the government's expert testified, heroin can be extremely lethal in its raw state. *See* Trial Tr., 77–98, Apr. 18, 2006. Processing heroin using cutting agents helps make it more suitable for personal consumption. Processing heroin also helps promote the conspiracy's goal of maximizing the profit it seeks because cutting increases the volume of the heroin that can be sold. *Id.* Cocaine base, more commonly known as

---

[5] The individuals who were involved in the "smuggling arm" of the conspiracy were: Darius Ames, Je Bradford, Charles Brown, Brian Doy, Huber Garcia, James Ingram, and Tyrone Thomas.

[6] Rather, as the government's drug expert, Detective A.O. Washington, testified, the cocaine in this case generally originates in South America, while the heroin at issue in this case generally originates in South America, Central America, and Asia. *See* Trial Tr., 77–98, Apr. 18, 2006, p.m.

crack cocaine, also cannot be made and distributed without first going through a processing procedure, which is generally accomplished by either baking or distilling raw cocaine. Once processed, all of the drugs must be packaged in small quantities so that the users can afford to purchase the drugs. Accordingly, the individuals in the processing arm of the conspiracy were essential to the success of the conspiracy's goal of selling drugs for profit because, without them, the drugs would not be ready for street-level consumption by end-users.

Next, the success of the conspiracy's goal of profit obviously depended upon the sale of the processed and packaged drugs by the members of the distribution arm of the conspiracy. This was accomplished by the street-level members of the conspiracy, including Ricky Gore, Chester Craig Simon, Eric Allison, Victoria Owens, Vincent Goldston, and Jay Ingram, who each sold the drugs at issue in this case to individuals on the street.

Finally, these links in the chain conspiracy were coordinated by the heads of the enterprise, defendants Eiland and Miller, in order to achieve the common goal of profiting from the sale of drugs in the Washington, D.C. area. The evidence showed that defendants Eiland and Miller co-managed the enterprise. Eiland and Miller used Alvin Gaskins as an administrative assistant to coordinate the logistical aspects of the conspiracy, such as purchasing or arranging: (1) plane tickets for the members to travel to obtain and smuggle the drugs; (2) cell phones to negotiate drug transactions; (3) and apartments where the drugs were stashed and processed.

As for defendant Thomas, evidence at trial showed that in addition to his involvement as a financial investor in the drug conspiracy, defendant Thomas was relied upon by defendants Eiland and Miller as an advisor in the drug trade. Defendant Thomas was also responsible for recruiting Tyrone Thomas to use his limousine service as a means to smuggle the drugs into the

10

Washington, D.C. area and then serving as a liaison between Tyrone Thomas and Eiland and Miller.

From this evidence, it is overwhelmingly clear "that each conspirator has agreed with the others . . . to further a common unlawful objective." *Tarantino*, 846 F.2d at 1393. The entire common goal of profiting from the sale of drugs would not have occurred without the street-level sale of the drugs at issue in this case by the distribution arm of the conspiracy. Of course, the distribution arm could not sell any drugs without the efforts of the members of the smuggling arm, who brought the non-indigenous drugs into the area, and the members of the processing arm, who diluted, processed, and packaged the drugs so that they could be consumed by end-users on the street. Finally, none of these arms could function cohesively without the leadership defendants Eiland, Miller, Timothy Thomas, and Gaskins, who funded, organized, and coordinated the overall activities of the drug conspiracy so that its common goal of profit could be accomplished. Accordingly, the Court finds that there was sufficient interdependence between the heads of the conspiracy and its various arms to support the existence of a single chain conspiracy.

### iii. *Evidence Shows Link Between Core Participants and Other Conspirators*

Third, the evidence clearly indicates that defendants Eiland and Miller were "core participants" in the conspiracy who are linked to the other conspirators in the case. Through defendant Timothy Thomas, defendants Eiland and Miller directed Tyrone Thomas to smuggle $50,000 to Phoenix, Arizona, and to smuggle back the five kilograms of cocaine that defendant Eiland was to purchase with that money.[7] Defendant Miller requested that Charles Brown accept

---

[7] *See supra* note 3.

a parcel of narcotics that was mailed to Brown's residence. Defendant Eiland, along with Darius Ames and Jay Ingram flew together to Phoenix, Arizona at defendant Eiland's request in order to purchase narcotics and to smuggle heroin back into the Washington, D.C. area by plane. Defendant Eiland directed Darius Ames to process the smuggled heroin so that it could be sold on the street. Defendant Eiland also told Ricky Gore to distribute the drugs to the street-level dealers so that they could be sold. Eiland also ordered Brian Lipscombe to kill Sorenson Oruche. Finally, wiretap evidence shows that defendants Eiland and Miller were in regular telephone contact and discussed their narcotics activity with each other. From this evidence, it is clear that defendants Eiland and Miller were the common link between each of the separate interdependent arms of the drug conspiracy at issue in this case. *See Gaviria*, 116 F.3d at 1517 (single conspiracy proven where "core participants" connect other conspirators).

*iv.     All Tarantino Factors Have Been Satisfied*

In conclusion, there is ample evidence that the standard set forth in *Tarantino* supports the jury's factual finding of a single chain conspiracy. The conspirators clearly had a common goal of profiting from the sale of narcotics in the Washington, D.C. area. Each of the arms of the conspiracy were interdependent upon each other in ensuring that this common goal was realized. And defendants Eiland and Miller were "core participants" who provided a common link between the various separate arms of the conspiracy. Accordingly, defendant Thomas's "fatal variance" argument must fail.

**b.     Issue of Prejudice**

Even if the evidence had demonstrated that multiple independent conspiracies existed instead of a single overarching conspiracy, defendant Thomas's "fatal variance" argument still

12

fails because he cannot demonstrate that his rights were substantially prejudiced.  First, there is no risk that the jury was confused or unable to strictly follow the Court's instructions on the single and multiple conspiracies.  As the D.C. Circuit has repeatedly found, "[a] jury is presumed to follow a trial court's instructions," particularly when the judge's instructions to the jury are clear, concise and careful.  *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000) (citing *United States v. Jackson*, 627 F.2d 1198, 1213 (D.C. Cir. 1980)).  Here, the Court very clearly instructed the jury regarding the issue of single versus multiple conspiracies.  Specifically, the Court stated with respect to the charge of "Conspiracy to Violate Narcotics Law" that "[i]f you [the jury] find that the evidence at trial did not prove the existence of the single overall conspiracy charged, or instead established other or different conspiracies, none of which are charged in the Indictment, *you must find the defendants not guilty* . . . ."  Jury Instructions at 52 (emphasis added).[8]  Such an instruction clearly, carefully, and concisely delineates the situations under which the jury could find the defendants guilty and not guilty of conspiracy.  Accordingly, defendant Thomas cannot show prejudice against him regarding the jury's understanding of the instructions given it by the Court.

  Second, the number of co-defendants tried in this particular case is sufficiently small so

---

[8] The Court explained further:

> This is so even if you find that some conspiracy other than the one charged in this Indictment existed, and even though the purposes of both conspiracies may have been the same and there may have been some overlap in membership.  Proof of several separate conspiracies is not proof of the single overall conspiracy charged in the Indictment. What you must determine is whether the single conspiracy as charged in Count 1 existed between two or more conspirators.  If you find that no such conspiracy existed, you must acquit the defendants of this charge.

(*Id.*)

as to mitigate the risk of "spillover prejudice" that might result from the jury imputing evidence from one conspiracy to another defendant involved in another conspiracy. *See Gaviria*, 116 F.3d at 1533 (internal citation omitted). As the D.C. Circuit pointed out in *Gaviria*, the risk of such spillover prejudice decreases and is less likely when fewer co-defendants are tried at the same time. *Id.* The *Gaviria* Court found that there was a minimal risk of spillover prejudice, if any, when four defendants were tried at the same time. *Id.*; *cf. United States v. Alessi*, 638 F.2d 466, 475 (2d Cir. 1980) (holding that 10 defendants was a sufficiently small number for jury to give individual consideration to each defendant). Similar to the defendants in *Gaviria*, only three defendants were tried together in this trial. Therefore, this Court finds that the risk of spillover prejudice was minimal in this case.

Third, the risk of spillover prejudice is lessened even further due to the nature of the evidence presented in this case. A jury is less likely to impute evidence from one conspiracy to another defendant "when the Government presents tape recordings of individual defendants . . . so that the jury has 'no need to look beyond each defendant's own words in order to convict.'" *Gaviria*, 116 F.3d at 1533 (quoting *United States v. Anderson*, 39 F.3d 331, 348 (D.C. Cir. 1994)). Here, as in *Gaviria*, the jury was presented with defendant Thomas's own words via recorded phone calls of conversations between defendant Thomas and the other conspirators. Indeed, the most damaging evidence against defendant Thomas were his own words in the recorded phone calls. For the foregoing reasons, defendant Thomas has failed to show that his rights were substantially prejudiced at trial.

    **c.**    **Defendant Thomas's Acts Constitute Participation in the Conspiracy**

Defendant Thomas argues that the drug transaction tying him to this case—the transport

of four kilograms of cocaine—was a single conspiratorial act that cannot constitute participation in a conspiracy.  *See* Def.'s Mot. [755] at 5 (citing *United States v. Lively*, 803 F.2d 1124, 1129 (11th Cir. 1986)).  Defendant's argument fails for two reasons.  First, the *Lively* court dealt with a jury instruction that said "*without a showing of knowledge*, a single, isolated act by defendant does not by itself constitute participation in a conspiracy." *Id.* (emphasis added).  Here, evidence offered at trial, including recorded phone calls between defendant Thomas and Tyrone Thomas, Eiland, and Miller, showed that defendant Thomas knowingly participated in the drug conspiracy.  Second, it is overwhelmingly clear based on the evidence that defendant Thomas did substantially more than a single conspiratorial act.  Defendant Thomas's participation in the conspiracy included among other things:  recruiting Tyrone Thomas to the organization and vouching for him; investing his own money toward the purchase of the five kilograms of cocaine; and updating Eiland and Miller on the status of Tyrone Thomas and the transported cocaine.[9]

Defendant further argues that no conspiratorial acts may be attributed to him during the course of his interaction with Tyrone Thomas after Tyrone Thomas was arrested.  Def.'s Mot. [755] at 5.  According to defendant, after Tyrone Thomas became a government agent, defendant Thomas was incapable of conspiring with him.  *See id.* (citing *United States v. Lewis*, 53 F.3d 29 (4th Cir. 1995) (finding reversible error where trial court gave no instruction that "a defendant cannot be convicted for conspiring with a government agent")).  Defendant's argument fails since evidence was offered at trial showing that defendant Thomas was involved in a conspiracy with Eiland, Miller, Tyrone Thomas, and others before Tyrone Thomas was arrested.  Further, even after Tyrone Thomas became a government agent and effectively withdrew from the conspiracy,

---

[9] *See supra* note 3.

defendant Thomas continued to participate in a conspiracy with Eiland, Miller, and others.

Based on the foregoing facts, this Court finds that defendant's various acts clearly constitute participation in a conspiracy at all relevant times and irrespective of Tyrone Thomas's later status as a government agent.

### d.    Conclusion

Defendant Thomas has failed to prove either:  "(1) that the evidence at trial established facts materially variant from those alleged in the indictment, [or] (2) that the variance caused substantial prejudice." *Tarantino*, 846 F.2d at 1391 (internal citation omitted).  Based on the evidence set forth at trial, it is clear that a single overarching conspiracy existed, that defendant Thomas was an integral part of it, and that even if the evidence showed multiple conspiracies, defendant Thomas has failed to establish any substantial prejudice against him.  Further, defendant Thomas has failed to show that his actions do not constitute participation in the conspiracy.  Therefore the Court finds that it cannot grant defendant Thomas's motion for a judgment of acquittal or a new trial on the grounds of a variance between the indictment and the evidence presented at trial.

### 2.    RICO Conspiracy

Defendant Thomas argues that the government failed to offer proof at trial establishing the three elements required for a RICO enterprise:  (1) a common purpose; (2) organization; and (3) continuity.  *See* Def.'s Mot. [755] at 6 (citing *United States v. Perholtz*, 842 F.2d 343, 362 (D.C. Cir. 1988), *cert. denied* 488 U.S. 821 (1988)).  This Court disagrees.  First, defendant's participation in the conspiracy shown via his investment toward the purchase of the four kilograms of cocaine prove that he and the other conspirators shared a common purpose of

16

profiting from the sale of drugs in Washington, D.C.  Second, the organization of the enterprise

consisted of the head (Eiland and Miller), a smuggling arm, a processing arm, a distribution arm,

and an enforcement arm.  Defendant Thomas assisted the head of the enterprise by recruiting

other members (Tyrone Thomas), helping finance the purchase of drugs, and serving as a liason

between the head and Tyrone Thomas (who was part of the smuggling arm).  Finally, the

enterprise demonstrated continuity by engaging in drug trafficking and distribution over a period

of several years, and through several different methods.

Defendant further argues that the government failed to prove that the racketeering acts

alleged against him were done in furtherance of the RICO conspiracy.  *See* Def.'s Mot. [755] at 6.

For the reasons set forth below, this Court is satisfied that there was sufficient evidence for a

reasonable jury to find defendant Thomas guilty of a RICO conspiracy.  In Racketeering Act 1,

the government presented evidence including Tyrone Thomas's testimony and recorded phone

calls showing that defendant Thomas was significantly involved in the organization's attempt to

transport four kilograms of cocaine from Phoenix, Arizona, to Washington, D.C.  The testimony

and recorded phone calls clearly support the jury's conclusion that defendant Thomas was a

participant in the narcotics conspiracy.  In Racketeering Act 5, the government presented

evidence showing that defendant Thomas used his phone to coordinate the details of the PCP

shipment between Miller and Tyrone Thomas.  That evidence easily supports the jury's finding

that defendant Thomas used a phone to facilitate that shipment.  In Racketeering Act 8, recorded

phone calls between defendant Thomas and Tyrone Thomas regarding the shipment of the four

kilograms of cocaine clearly support the jury's finding that defendant Thomas attempted to

possess the cocaine and used a phone to facilitate the transaction.  Finally, with respect to

Racketeering Act 10, recorded phone conversations of defendant Thomas and others firmly support the jury's finding that defendant Thomas used the phone to attempt to receive one kilogram of cocaine left at the Hampton Inn.

       3.     *PWID and Unlawful Use of a Communication Facility Counts*

Defendant Thomas argues that the 0.41 grams of powder cocaine that was found at his residence is consistent with personal use, and as such, the government failed to present evidence sufficient to prove his intent to distribute. *See* Def.'s Mot. [755] at 7. The government counters that additional items found during the search of defendant's residence, including numerous empty ziplock bags and a professional pocket scale with cocaine residue, negate defendant's "personal use" argument. *See* Gov's Opp'n at 22. This Court finds that these items, in conjunction with the evidence showing defendant's involvement in the shipment of four kilograms of cocaine from Arizona, provide ample support for the jury's conclusion that defendant had the intent to distribute.

Defendant Thomas further claims that the government failed to establish at trial that he used a communication facility to facilitate a drug trafficking offense. Having already found that the evidence at trial clearly supported the jury's findings that defendant was guilty of a narcotics conspiracy and a RICO conspiracy, this Court rejects defendant's argument that he is entitled to acquittal on this ground.

## C.    Defendant's Motion for a New Trial

       1.     *Defendant's Entitlement to a New Trial Based on Newly Discovered Evidence*

Defendant argues that he is entitled to a new trial based on "newly discovered evidence" showing that one of the government's witnesses wrongfully attributed multiple kilograms of

cocaine to the Eiland/Miller conspiracy. *See* Def.'s Mot. [755] at 9–10; Def.'s Suppl. Mot. [930] at 1–2. Defendant raises this issue in his alternative motion for a new trial [755] and again in his supplemental motion [930], where he includes documents obtained since trial. Defendant repeats his arguments in an additional motion [974] for a new trial filed nine months after the jury's verdict.

This Circuit follows a five-part test for granting a new trial based on newly discovered evidence. A new trial should be granted only if when the following five conditions are met: (1) the evidence has been discovered since trial; (2) the party seeking the new trial has shown diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the evidence is of such nature that in a new trial it would probably produce an acquittal. *See United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (quoting *Thompson v. United States*, 188 F.2d 652, 653 (D.C. Cir. 1951)). For the reasons set forth below, this Court finds that the evidence raised in defendant's motions does not meet the required standard for a new trial.

During defendant's trial, the government elicited testimony of Je' Dukobi Bradford regarding his purchase of seven kilograms of cocaine in Texas. Bradford testified that he sold one of those seven kilograms of cocaine to Eiland for $24,000. Bradford further testified that he sold some of the remaining kilograms of cocaine to other people, including Kenneth Thomas. Prior to Bradford's testimony, the government provided defendant Thomas with a redacted version of Bradford's testimony from a prior proceeding in the Eastern District of Virginia. Defendant claims that at the time the redacted testimony was provided, defendant was not aware of the title of the case, the correct name of the individual against whom Bradford testified, or the

19

case docket number. *See* Def.'s Mot. [755] at 8–9. Defendant has since obtained a full transcript

of Bradford's testimony from that proceeding. According to defendant, the full transcript shows

Bradford attributing the same seven kilograms of cocaine to Kenneth Edmond Thomas. *See*

Def.'s Mot. [930] at 1–2. Defendant argues that throughout his trial and during the government's

closing argument, the government improperly attributed the seven kilograms of cocaine to the

Eiland/Miller conspiracy. *See* Def.'s Mot. [755] at 9. Defendant claims that he is entitled to a

new trial since he has been prejudiced by the government's presentation and argument attributing

the same cocaine to two separate conspiracies—the Kenneth Edmond Thomas conspiracy on one

hand and the Eiland/Miller conspiracy on the other.

     The government counters that it did not argue that the entire seven kilograms Bradford

purchased in Texas should be attributed to the Eiland/Miller conspiracy. The government further

claims that to the extent that it made reference to the seven kilograms in its closing argument, it

was to provide background information on how the narcotics were supplied to Eiland. *See* Gov's

Opp'n at 23.

     This Court finds that defendant's evidence fails multiple prongs of the *Lafayette* test. The

substance of the evidence fails the third element of the test, that the evidence is not merely

cumulative or impeaching, because it is not inconsistent with Bradford's testimony at defendant

Thomas's trial. In Kenneth Edmond Thomas's trial, Bradford testified that of the seven kilograms

of cocaine, he sold four to Kenneth Thomas, and two kilograms to two other people. *See* Ex. to

Def.'s Suppl. Mot. [930] at 2. He further testified that after those transactions, he still had one

remaining kilogram of cocaine. Viewing the evidence in the light most favorable of the

government and drawing all reasonable inferences in the government's favor, a reasonable trier of

fact could have found that the one remaining kilogram was sold to Eiland's group. Accordingly, this Court finds that Bradford's testimony in Kenneth Thomas's trial is consistent with his testimony in the instant case.

To the extent Bradford's testimony from Kenneth Thomas's trial was not merely cumulative or impeaching, it fails the fourth prong of *Lafayette* because it is immaterial to the issues involved. Defendant's main contention as to why the newly discovered evidence requires a new trial is that the government wrongfully attributed seven grams of cocaine to the Miller/Eiland conspiracy. Given that defendant Thomas's jury ultimately found him responsible for "500 grams or more but less than 5 kilograms" of cocaine, it is clear to this Court that Bradford's testimony regarding seven kilograms of cocaine was immaterial to the jury's determination of guilt. The jury's verdict is entirely consistent with its conclusion that defendant Thomas was responsible for the four kilograms of cocaine transported from Arizona.

Finally, this Court finds that the newly discovered evidence fails to satisfy the fifth element of *Lafayette*, that in a new trial the evidence would probably produce an acquittal. Despite the jury's finding that defendant was responsible for less than five kilograms of cocaine, defendant argues that the government's evidence regarding the seven kilograms of cocaine prejudiced him by "incorrectly painting him as a major player in the narcotics world." Def.'s Mot. [755] at 14. In light of the overwhelming evidence presented regarding defendant's involvement in the purchase and shipment of four kilograms of cocaine as part of an overarching narcotics conspiracy, this Court sees no basis to conclude that a new trial would probably produce an acquittal. As such, this Court shall deny defendant's motion for a new trial on the basis newly discovered evidence.

   2.    *Defendant's Entitlement to a New Trial Based on Interest of Justice*

Defendant claims that the interest of justice demand that he be afforded a new trial because the government failed to produce Special Agent Dan Sparks's notes ("302s") of his interview with Tyrone Thomas as Jencks, *Giglio*, and/or *Brady* material.  *See* Def.'s Mot. [755] at 19–20.  Defendant speculates that the 302s would show that Tyrone Thomas never asserted that any portion of the cocaine was to be delivered to defendant Thomas, or that defendant Thomas was in any way involved in that transaction.  Def.'s Mot. [755] at 21.  Defendant argues that under the analysis set forth by *Strickler v. Greene*, 527 U.S. 263 (1999):  (1) the 302s were favorable to Mr. Thomas as both exculpatory and impeaching evidence; (2) the 302s were suppressed by the government, albeit, apparently inadvertently; and (3) Mr. Thomas was prejudiced by their suppression as he was convicted of counts related to the four kilograms of powder cocaine, and did not have the opportunity to use the 302s to show that he was not a party to the four kilogram transaction.  Def.'s Mot. [755] at 21.  The government maintains that it has fulfilled all of its discovery obligations for its witnesses.  *See* Gov's Opp'n at 25.  The government further contends that assuming *arguendo* that such 302s exist, they would not be inconsistent with Tyrone Thomas's testimony at trial.  *See id.*  The government argues that even if Tyrone Thomas told Special Agent Sparks that the drugs were bound for Eiland, that information does not impeach Tyrone Thomas's trial testimony that defendant Thomas recruited him into the enterprise, invested money toward the purchase of the four kilograms of cocaine, and acted as a liason between Tyrone, Eiland, and Miller.  This Court agrees.  In light of the abundant evidence offered at trial showing defendant's significant involvement in the four kilogram of cocaine transaction, any possible impeachment value of the 302s would have been negligible at best.  As

such, this Court rejects defendant's argument that the 302s would have been exculpatory or that defendant was prejudiced by their suppression.

Defendant further claims that "it is probable that the 302s could be fairly characterized as Tyrone's own words, or were approved or adopted by Tyrone Thomas, and should have been provided as Jencks for Tyrone." Def.'s Mot. [755] at 21. This Circuit has stated that notes of a conversation are not Jencks Act material unless they represent a full transcription or were reviewed and adopted by the interviewee. *United States v. Oruche*, No. 06-3100, Slip. Op. at 11 (D.C. Cir. May 4, 2007). This Court has no basis to conclude that the 302s represent a full transcription or were ever reviewed or adopted by Tyrone Thomas. As such, the Court shall reject defendant's arguments that the government failed to produce them as Jencks material.

   3.    *Defendant's Entitlement to a New Trial Based on Trial Errors*

Defendant Thomas urges the Court to grant him a new trial based on several errors that he alleges were made by the Court during his trial. For the foregoing reasons, defendant's motion for a new trial due to trial errors shall be denied. The Court will address each of defendant's arguments in turn.

   a.    **Court's Response to Jury Questions**

The jury in defendant Thomas's trial deliberated for approximately three weeks before returning its verdicts. During deliberations, the jury issued several notes asking for the Court's assistance confirming which recorded telephone calls corresponded to specific counts and acts in the Indictment. Defendant claims that he is entitled to a new trial because the Court's responses to the jury notes "breached the sanctity of the deliberative process and transformed the Court into the thirteenth deliberating juror." Def.'s Reply [973] at 1–2. Specifically, defendant asserts that

23

at times when the jury was unable to find certain calls as charged on the Indictment, the Court improperly directed the jury to calls the government alleged related to the charges in question. According to the defendant, the jury's need for assistance with the recorded calls indicates an "impermissible variance between the allegations charged against Mr. Thomas in the Indictment and the proof offered at trial." Def.'s Mot. [755] at 22. The government explains that the Indictment contained "minor typographical errors in the dates and times of the recorded calls." Gov's Opp'n at 26. The government further contends that the Indictment alleged dates and times of the phone calls in an "on or about" format, and that the jury was instructed that proof need not establish with certainty the exact date of the alleged offense. *Id.*

A minor variation in date between an indictment and evidence presented at trial is not a fatal variance where there is no showing of prejudice. *See Cogdell v. United States*, 307 F.2d 176, 178 (D.C. Cir. 1962), *cert. denied*, 371 U.S. 957 (1963). In the instant case, defendant Thomas has failed to show that he has been prejudiced by the Court's clarifications. Moreover, this Court maintains that the guidance it provided to the jury was both appropriate under the law of this Circuit and well within its discretion. *See United States v. Ayeni*, 374 F.3d 1313, 1316 (D.C. Cir. 2004) (recognizing that a "district court enjoys broad discretion in controlling the jury during deliberations . . . includ[ing] the authority to decide what to do when the jury encounters stumbling blocks in its deliberations") (internal citations and quotations omitted). To be sure, this Court does not read *Ayeni* as precluding the Court from supplying the jury a recorded phone call or informing the jury that they in fact already have the call or where they can find it amidst the more than 24,000 recorded calls available. Defendant argues that the Court's responses substituted for the jurors' recollection and therefore constitute an intrusion into the jury

24

deliberations.  *See* Def.'s Reply at 8.  In one of the instances that defendant alleges that the Court

acted as a "thirteenth deliberating juror," the jury mistakenly informed the Court that a call they

were trying to find did not exist on the provided CD, the Court responded with a note identifying

how to find such a call.  In other instances, the Court merely confirmed or identified the

existence and location of recorded calls.  All of the calls had been properly admitted into

evidence and were available for jury review upon request.  The Court's responses to the jury's

questions said nothing as to the factual findings that the jury needed to make in its determination

of what facts have been proven or whether those facts amounted to a criminal violation.

Therefore, this Court was soundly within its discretion in responding to the jury questions at

issue.  As such, defendant's motion for new trial on grounds that the Court erred in its responses

to jury questions shall be denied.

### b.    Entrapment Instruction

Defendant Thomas argues that he is entitled to a new trial since the jury was not provided

with an instruction regarding the defense of entrapment.  *See* Def.'s Mot. [755] at 25.  Defendant

points to a note issued by the jury during deliberations asking the Court for the legal definition of

entrapment.  *See id.*  The entrapment defense has two elements: (1) government inducement to

commit a crime, and (2) lack of predisposition on the part of the defendant to commit the crime.

*United States v. Layeni*, 90 F.3d 514, 516 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1099 (1997).

Accordingly, the entrapment instruction is not available where there is no evidence of

government inducement to support such a defense.  *See id.* at 518 (affirming denial of entrapment

instruction where there was no evidence that government used inducements to commit a crime).

In the instant matter, Defendant Thomas argues that the government relied on Tyrone Thomas's

long, personal history with defendant in order to induce him to commit a crime. *See* Def.'s Mot. [755] at 27. Evidence offered at trial, however, clearly established defendant Thomas's role in the drug conspiracy *prior to* Tyrone Thomas's arrest and subsequent status as a government agent. In light of that evidence, this Court maintains that there was no government inducement for defendant Thomas to commit a crime. As such, this Court shall deny defendant's motion for a new trial on grounds that the Court erred in refusing to instruct the jury on the defense of entrapment.

### c.  Cross-Examination of Tyrone Thomas

Defendant Thomas claims that this Court erred in its limitation of defendant's ability to cross-examine Tyrone Thomas regarding Tyrone's history of mental illness. *See* Def.'s Mot. [755] at 29. Specifically, this Court held that defendant Thomas could not admit the following two exhibits into evidence: (1) a judicial opinion from the Eighth Circuit which found that Tyrone Thomas feigned paranoid schizophrenia in a previous criminal case; or (2) a psychological evaluation prepared to evaluate Tyrone Thomas for placement in the government's Witness Security Program. At a hearing on this issue, defendant argued that he should be permitted to introduce the documents into evidence so that he could question Tyrone Thomas on his use of paranoid schizophrenia "to his advantage." Trial Tr., 49, Apr. 3, 2006. The Court rejected defendant's argument at trial and now defendant argues that he is entitled to a new trial based on the Court's refusal to admit the two documents at issue. Defendant Thomas ignores that the law is quite clear is this area. Federal Rule of Evidence 608(b) precludes impeachment of witness credibility by extrinsic evidence of specific instances of conduct. Moreover, this Circuit has long made clear that witnesses "may not be impeached as to credibility by producing

extrinsic evidence of prior instances of misconduct short of conviction." *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C. Cir. 1976). Even if the Court believed that the documents in question were legally admissible to impeach Tyrone Thomas, defendant Thomas failed to demonstrate that the documents would add any probative value in the instant trial. As such, this Court shall deny defendant's motion for a new trial on grounds that this Court improperly limited defendant's cross-examination of Tyrone Thomas.

### d.     Testimony of Melvin Wider

Defendant Thomas claims that he is entitled to a new trial due to the Court's denial of his motion in limine to preclude the testimony of government witness Melvin Wider. *See* Def.'s Mot. [755] at 30. According to defendant, Mr. Wider acted as a government agent during jailhouse conversations with two of defendant Thomas's co-defendants. *Id.* at 31. Defendant argues that Mr. Wider's testimony was in violation of the Sixth Amendment and inadmissable under *Massiah v. United States*, 377 U.S. 201 (1964) (holding that the government is prohibited from using against a defendant evidence gleaned by fellow prison inmates acting as government agents). This Court admitted Mr. Wider's testimony on grounds that it was admissible as statements made by a co-conspirator in furtherance of a conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E). The Court's decision rested on evidence at trial demonstrating that defendants Eiland and Bryant made statements to Mr. Wider in furtherance of the Eiland/Miller conspiracy. In light of this evidence, the Court rejects defendant Thomas's argument that the Court's admission of Mr. Wider's testimony entitles him to a new trial. Further, even if *Massiah* applied to the instant case, defendant has failed to show how Mr. Wider's testimony has violated his substantial rights. That is, even if Mr. Wider's testimony was stricken in its entirety, there is

27

overwhelming evidence via testimony and recorded phone calls clearly establishing defendant

Thomas's role in the conspiracy. As such, this Court sees no basis for granting defendant's

motion for a new trial on the basis of any error attributed to Mr. Wider's testimony.

     **e.**     **Audio Evidence Provided to the Jury**

Defendant Thomas asserts that he is entitled to a new trial as a result of errors made

regarding audio evidence of wiretapped and consensual telephone calls that was provided to the

jury. *See* Def.'s Mot. [755] at 32. All of the recorded evidence was admitted into evidence at the

start of the trial. In sum, the evidence amounted to more than 24,000 recorded phone calls. A

CD containing only those calls that were actually played during trial, however, was sent back to

the jury for deliberation. With respect to the calls that had not been played in court, the jury was

instructed that it could review those calls upon request. *See* Jury Instructions [769] at 90. In

light of these facts and the sheer volume of calls admitted into evidence, this Court finds that it

was entirely reasonable and proper to provide the jury with only those calls that were played in

court.[10]

Defendant further argues that he was substantially prejudiced by the Court's failure to

order that the audiotape evidence provided to the jury was properly redacted. *See* Def.'s Mot.

[755] at 33. Missing from defendant's arguments, however, is any indication whatsoever of

---

[10] Defendant disputes whether the Court properly responded to a jury note inquiring about intended calls. *See* Def.'s Reply at 6. In its response, the Court directed the jury to a number of recorded phone calls, including one that had not been played in court—Call #6154. *See id.* Having already found that this Court was soundly within its discretion in responding to the jury's questions, and given that *all* of the calls had been properly admitted into evidence at the start of trial and were available for the jury's review, this Court sees no basis to grant defendant's motion for a new trial. Moreover, viewing the evidence in the light most favorable to the government, defendant has failed to show how this call violates his substantial rights.

which calls are at issue and/or the allegedly prejudicial content of those calls. Moreover, defendant raised no objection to the calls at the time they were sent back to the jury. Even further, there is no basis for this Court to find that the unredacted portions of the calls amount to a violation of defendant's substantial rights considering the abundance of evidence showing defendant's involvement in the conspiracy.

### 4.     *Defendant's Entitlement to a New Trial Based on the Weight of the Evidence*

Defendant Thomas claims that he is entitled to a new trial as the weight of the evidence does not support his convictions for Narcotics Conspiracy, RICO Conspiracy, and PWID Cocaine. Having already found that there was ample evidence for the jury to conclude that defendant Thomas was guilty of these charges, *see* Part B.1–3 *supra*, this Court rejects defendant's arguments.

### 5.     *Grand Jury Process*

Defendant Thomas attacks the government's use of the grand jury process as having "deprived him of his due process rights to a fair trial." Def.'s Mot. [755] at 38. Defendant argues that the government lacked authority to move the grand jury investigation of defendant's case from one grand jury to another after information about the investigation was leaked. *Id.* at 38–39. Defendant's claim has already been decided by this Court on two separate occasions. *See* Mem. Op. [415] at 9, Oct. 26, 2005 (refusing to dismiss the indictment since defendant failed to prove that he suffered any prejudice as a result of the use of the second grand jury); Mem. Op. [591] at 17, Mar. 2, 2006 (same). Just as the Court stated the last time defendant raised this claim, defendant's motion presents no new basis for his arguments, and there are no new facts that justify additional inquiry into the matter. As such, defendant's motion for a new trial based

29

on these grounds shall be denied.

**D.    Defendant's Supplement to his Motion for a New Trial, or in the Alternative, Motion for a New Trial**

Defendant raises several additional arguments that he is entitled to acquittal or a new trial in his supplemental motion filed on March 5, 2007. This Court has already addressed defendant's arguments related to newly discovered evidence in Part II.C.1., *supra*. Defendant's supplement further arguments that are unrelated to the newly discovered evidence. Under the law of this Circuit, this Court lacks jurisdiction to proceed on any Rule 33 motion based on grounds other than newly discovered evidence that has been filed outside of the time fixed by the Court within the seven-day period of time following the verdict. *See United States v. Hall*, 214 F.3d 175, 178 (D.C. Cir. 2000) (holding that "[a] court can only extend the time in which to grant a motion for a new trial if a court fixes such a time within 7 days of the verdict or finding of guilty"). As such, the remaining arguments raised in defendant's supplement are untimely and are not properly before this Court. Even if these issues had been properly raised, this Court would reject defendant's claims for the reasons outlined below.

*1.    Bolstering of Wiretap Evidence*

Defendant asserts that in light of "newly discovered legal authority," he is entitled to a new trial because the government's improperly bolstered its case by having Special Agent Scott Turner testify regarding the process of obtaining Title III wiretaps. *See* Def.'s Suppl. Mot. [930] at 2 (citing *United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006) (overturning conviction where testimony explaining wiretap approval process had been introduced)). The authority cited by defendant Thomas is not binding on this court, and in any event, it is not persuasive in this

context in light of the overwhelming evidence presented against defendant outside of the agent's testimony. As such, even if the testimony was error, it was harmless error at best. Further, given that *Cunningham* was decided several months after Special Agent Turner testified, the government could not have anticipated this claim. Accordingly, defendant's motion for a new trial shall be denied.

2.    *Authenticity of Tapes*

Thomas argues in his supplement to his motion for a new trial, or in the alternative, motion for a new trial, that the government failed to establish chain of custody to support admission of copies of consensual calls rather than the original recordings. *See* Def.'s Mot. [930] at 2–3. According to defendant, the government's inability to confirm when the copies of the calls were made or by whom requires that all the calls be excluded. *See id.* at 3. The government counters that the tapes were properly authenticated by testimony from Tyrone Thomas showing that he reviewed the tapes and affirming their accuracy. *See* Gov's Opp'n [966] at 33 (citing *United States v. Strothers*, 77 F.3d 1389, 1392 (D.C. Cir. 1996) (recognizing that "[t]apes may be authenticated by testimony describing the process or system that created the tape or by testimony from parties to the conversation affirming that the tapes contained an accurate record of what was said" (internal citations and quotations omitted))). This Court agrees. Given that the recordings were properly authenticated through the testimony of Tyrone Thomas—a party to the conversations—this Court finds that the admission of the recorded phone calls was clearly within its sound discretion. *See Strothers*, 77 F.3d at 1392 ("The admission of recordings into evidence is committed to the sound discretion of the trial court, so long as the tapes are authentic, accurate, and trustworthy.") (internal citations omitted).

3.    *Entrampment Instruction*

In his supplemental pleading, Defendant further argues that the rule in *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965), supports his claim that he is entitled to a new trial as a result of the Court's refusal to instruct the jury as to entrapment.  *See* Def.'s Suppl. Mot. [930] at 5.  In *Sears*, the Fifth Circuit held that conspiracy liability is prohibited where the only other co-conspirator is a government agent.  *Sears*, 343 F.2d at 142.  According to defendant Thomas, there is no basis for his conspiracy conviction as it relates to actions committed once Tyrone Thomas became a government agent.  Having already found that defendant was charged and convicted of a Narcotics Conspiracy and a RICO Conspiracy that existed both before and after Tyrone Thomas became a government agent, this Court finds no basis for a new trial under the *Sears* rule.

4.    *FBI's 302's Pertaining to Tyrone Thomas*

Defendant also argues that the government failed to provide Special Agent Sparks's 302s related to Tyrone Thomas's statements about an alleged murder-for-hire plot.  *See* Def.'s Suppl. Mot. [930] at 5.  Defendant asserts that the information contained in the 302s is "material to his defense given Tyrone Thomas's central role in the government's case." *Id.* at 6.  This Court need not address this issue since the jury found that the government had not proven defendant Thomas's involvement in a conspiracy to commit murder.  *See* Verdict Form.  As such, the government's failure to produce 302s on this issue, should any exist, has no bearing on defendant's substantial rights.

### III. Conclusion

Upon a thorough review of defendant's filings, the applicable law and the entire record

herein, this Court has determined that the motions [755, 930, 974] for judgment of acquittal and in the alternative for new trial shall be DENIED.

A separate Order shall issue this date.


Signed by Royce C. Lamberth, United States District Judge, November 27, 2007.